## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| **THE AFI EXHIBIT LLC** <br> 1170 Ocean Parkway Suite 12K <br> Brooklyn, New York, 11230 | * <br> <br> * | |
| and | * | |
| **485EV ASSETS, LLC** <br> 1170 Ocean Parkway, Suite 10G <br> Brooklyn, New York 11230 | * <br> <br> * | |
| Plaintiffs | * | Civil Action No. |
| v. | * | |
| **NH SPECIAL EVENTS, LLC** <br> 2405 York Road, Suite 201 <br> Lutherville-Timonium, Maryland 21293 | * <br> <br> * | |
| <u>SERVE ON</u>: <br> **The Corporation Trust, Inc.** <br> **Registered Agent** <br> 2405 York Road, Suite 201 <br> Lutherville-Timonium, <br> Maryland 21293 | * <br> <br> * <br> <br> * <br> <br> * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT

Plaintiffs, The AF1 Exhibit LLC and 475EV Assets, LLC, by their undersigned attorneys, hereby sue Defendant, NH Special Events, LLC, and states as follows:

### Jurisdiction and Venue

1. Plaintiff, The AF1 Exhibit LLC ("AF1"), is a limited liability company organized and existing under the laws of the State of New York.

2. Plaintiff, 485EV Assets, LLC ("485EV"), is a limited liability company organized and existing under the laws of the State of New York.

3. Defendant, NH Special Events, LLC ("NH"), is a limited liability company organized and existing under the laws of the State of Maryland. This Court possesses personal jurisdiction over Defendant. *See* FED. R. CIV. P. 4; MD. CODE ANN., CTS. & JUD. PROC. § 6-102.

4. This Court possesses subject matter jurisdiction over this action as the parties hereto are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. *See* 28 U.S.C. § 1332 (LEXIS 2015); *see also Carden v. Arkoma Assocs.*, 494 U.S. 185 (1989); *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114 (4th Cir. 2004).

**Facts Common to All Counts**

5. AF1 owned a Boeing 747-212B freighter airframe, Manufacture's Serial Number 20712, U.S. Registration N485EV (the "Airframe").

6. 485EV owned four (4) Pratt & Whitney JT9D-71 Engines, bearing manufacturer's serial numbers 662309, 662971, 662949, and 689551 (the "Engines"), as well as other parts and equipment. The Airframe and Engines shall be referred to collectively as the "Aircraft."

7. AF1 and 485EV entered into an agreement with Franklin Exhibits Management Group, LLC ("Franklin"), under which Franklin improve the interior and exterior of the Aircraft to build an authentic replica VA-25A airplane, commonly known as "Air Force One," and displaying the Aircraft as an interactive exhibit for educational purposes (the "Air Force One Exhibit").

8. Franklin undertook great effort to transform the Aircraft into an authentic replica of Air Force One. The Aircraft had a value exceeding $6,000,000.

2

9. On or about August 13, 2018, Franklin and NH entered into a License Agreement (the "Agreement"), under which Franklin received a license to exhibit the Aircraft in an area identified as Southpointe (the "License Area") within National Harbor.

10. The initial license period commenced on or about August 12, 2018 and terminated January 8, 2019 (the "License Period").

11. The Aircraft was approximately 225 feet in length with a wingspan of approximately 195 feet. It could not be disassembled without destroying the Aircraft, rendering it too large to be transported other than by barge on waterways.

12. Due to its extraordinary size, there were a limited number of barges adequate to transport the Aircraft and it typically requires months of coordination to arrange for shipment of the Aircraft by barge.

13. Contemplating the challenges associated with transportation of the Aircraft, the Agreement addressed the potential that circumstances in which removal of the Aircraft from National Harbor could be delayed at the conclusion of the License Period in three ways.

14. First, the Agreement stated, at the conclusion of the License Period, if Franklin "is unable to (i) procure a barge or other vessel to remove the Aircraft from the License Area, which unavailability must be proven to the reasonable satisfaction of [NH], (ii) obtain necessary approvals from governmental and/or regulatory authorities despite diligent efforts to do so, or (iii) get reasonably full, clear and unrestricted access to the License Area for all manpower and equipment required to prepare and remove the Aircraft from the License Area, then [Franklin] shall have up to four (4) options to extend the Event for one (1) month each, during which [Franklin] may continue to operate the Event, for $50,000 for each month's extension" (hereinafter referred to as "Extension Option").

15. Second, the Agreement provided:

> In addition to its other rights and remedies hereunder, in the event [Franklin] fails to timely surrender the License Area to the as required by this Agreement (an "Unauthorized Holdover"), then an "Unauthorized Holdover Fee" will be assessed to [Franklin] in the amount of One Thousand Five Hundred and No/100 Dollars ($1,500.00) per day, which shall be paid in immediately available funds to [NH] upon demand, and [Franklin] shall also remain liable to [NH] for damages arising out of said Unauthorized Holdover.

16. Third, in the event Franklin held over, the Agreement provided that NH could use self-help to remove the Aircraft from the *License Area*:

> [I]n the event [Franklin] fails to timely vacate and surrender the License Area at the end of the License Period, . . . [NH] shall be entitled to exercise self-help and/or any and all other legal remedies to cause the removal of [Franklin], its property and personnel from the License Area.

17. Importantly, the Agreement did not authorize NH to destroy the Aircraft.

18. Although the Initial Period of the Agreement commenced on August 12, 2017, due to the complexity of coordinating shipment of the Aircraft to National Harbor, it did not arrive until the beginning of October 2018, causing Franklin to lose approximately 40% of the Initial Period, for which it had paid substantial consideration.

19. NH recommended that Franklin use its affiliated management company to market and manage the exhibit. Franklin complied with NH's recommendation.

20. The Aircraft was displayed and opened to the public as the "Air Force One Experience."

21. Due to a general lack of interest and attendance at National Harbor, the Exhibit did not perform as well as anticipated. Accordingly, Franklin decided not to renew the Agreement and instead would move the Aircraft to a more commercially favorable location in New York City.

22. On or about January 8, 2019, in accordance with the Agreement, Franklin paid $50,000 to NH to extend the term by an additional month as Franklin was unable to procure a

barge to remove the Aircraft by January 8, 2019.

23. Franklin subsequently remitted a second payment of $50,000 to NH, attempting to extend the term until March 8, 2019.

24. However, on or about February 1, 2019, NH informed Franklin it was terminating the Agreement and it returned Franklin's second payment.

25. In the February 1, 2019 termination letter, NH gave Franklin the unreasonably short period of fourteen days to remove the Aircraft from National Harbor. NH was well aware this was insufficient time for Franklin to secure a barge and take all other necessary steps to remove the Aircraft.

26. On or about February 22, 2019, NH barred Franklin from accessing the Aircraft and the License Area entirely.

27. By February 25, 2019, it became clear that the tail of the Aircraft was becoming damaged by high winds. NH initially denied Franklin access to the Aircraft to take steps to mitigate the damage.

28. Franklin engaged a contractor to repair the tail, a necessary step in preparing the Aircraft for removal. Beginning on February 28, 2019, and continuing for months, NH provided sporadic access to Franklin's contactor, but failed to give Franklin's contractor unfettered access to perform the necessary repairs, which frustrated Franklin's efforts to complete the repairs and remove the Aircraft.

29. Despite the many obstacles created by NH, the repairs were completed in September 2019, but Franklin was unable to remove the Aircraft due to a piling under water that prevented access to the Aircraft by a barge. Franklin previously advised NH of the piling, but it refused to have it removed. NH eventually allowed Franklin to remove the piling in November

2019.

30. In September 2019, Franklin hired a contractor to perform a gas inspection of the Aircraft, which had to be done within a short period of time before removal of the Aircraft. NH again refused to provide unfettered access to the Aircraft, which increased the cost to NH and further delayed the removal process.

31. Beginning in October 2019, NH began to threaten to dismantle the Aircraft.

32. In February 2020, NH permitted Franklin to access the Aircraft again to perform repairs and prepare for its removal, but again the access was sporadic and further frustrated Franklin's efforts to remove the Aircraft.

33. On March 10, 2020, NH demanded that Franklin remove the Aircraft within 14 days, as well as agree to a judgment against it, release all claims against NH, and other stipulations. Needless to say, Franklin was unable to engage a rigger and barge to remove the Aircraft within such a short period of time.

34. On April 2, 2020, NH informed Franklin that it would no longer be permitted to access the License Area.

35. In a further attempt to compel the removal of the Aircraft, which it has prevented by its refusal to cooperate with Franklin, NH filed a Complaint for Possession of Real Property against Franklin in the District Court of Maryland for Prince George's County. NH failed to include Plaintiffs in such lawsuit.

36. On October 20, 2019, NH moved for permission to dismantle the Aircraft, which the District Court denied.

37. On February 28, 2020, the District Court issued an order authorizing the Sheriff to execute a Warrant for Restitution to "evict" the Aircraft, permitting NH Special Events to move the

6

Aircraft to "(1) a waterfront ramp that is located behind the License Area; (ii) an empty, private parking lot located adjacent to the License Area; or (iii) a public road in front of the License Area."

38. NH subsequently moved the Aircraft from the License Area.

39. On March 10, 2020, NH demanded that Franklin remove the Aircraft from National Harbor within 14 days.

40. On March 16, 2020, the Governor of Maryland issued an Executive Order, in which he closed non-essential businesses and ordered non-essential workers to remain at home to the COVID-19 pandemic (the "Stay-at-Home Order").

41. The Stay-at-Home Order made it more difficult, if not impossible, to engage the necessary contractors to remove the Aircraft. Franklin was advised by numerous vendors that they were unavailable during this time period.

42. On April 2, 2020, despite the unreasonable 14-day deadline and the Stay-at-Home Order, NH falsely asserted that Franklin has abandoned the Aircraft and advised that its contractors were "no longer permitted to access the area where the Airplane is presently located."

43. On May 1, 2020, NH again demanded that Franklin remove the Aircraft from National Harbor by May 22, 2020. When Franklin responded that it was unable to remove the Aircraft within such a short period of time, NH again threatened to dismantle the Aircraft.

44. On May 11, 2020, Franklin expressly informed NH that it had not abandoned the Aircraft and reiterated that it intended to remove the Aircraft as soon as possible: "[Franklin] fully intends to reclaim the Aircraft from National Harbor and anxious to do so."

45. On May 10, 2020, Franklin again sought NH's cooperation in attempting to remove the Aircraft:

Franklin would like to reclaim the Aircraft.  If [NH] is willing in good faith to release the Aircraft, it is requested that [NH] please provide detailed photographs of the exterior and interior of the Aircraft in its current condition, as well as its current location and all potential pathways to the Potomac River.  This might enable Franklin to advance its efforts to engage the necessary contractors.  If [NH] is not willing to provide current photographs, please allow a representative of Franklin to inspect and take photographs of the Aircraft and its current location.

46. In response, NH stated that it had no obligation to return the Aircraft or keep it at National Harbor for any length of time.

47. On May 29, 2020, Franklin noted that Prince George's County was under a Local State of Emergency, but stated that it would be prepared to inspect and photograph the Aircraft within 1-5 days of a Modified Phase 1 Reopening.

48. On July 6, 2020, Franklin again reiterated that it intended to remove the Aircraft and sought NH's cooperation:

As I have previously stated, it is the intent of [Franklin] to remove the Aircraft that is at issue in the above litigation from National Harbor.  To that end, there is a barge currently available that could be used to remove the Aircraft.  It is one of the only barges that can hold an airplane of this size and weight.  It is currently located in Virginia.  Franklin would like to contact the barge to remove the Aircraft.  In order to do so, it must undertake the following steps:

[a]. Conduct a detailed inspection of the Aircraft to confirm it is safe for removal;
[b]. Conduct a detailed inspection of the current location of the Aircraft and path to the waterway;
[c]. Order and conduct an updated underwater scan and sonar side-scan to confirm the barge can move into position at water's edge and that there are no new obstructions;
[d]. Have tests conducted to re-certify the Aircraft as "gas free;"
[e]. Shrink-wrap the engines for transit; and
[f]. Obtain the necessary Coast Guard approval.

49. In response, NH stated that the Aircraft had to be removed by August 18, 2020 or it would be dismantled and removed from National Harbor.

8

50. On July 30, 2020, Franklin informed NH that it had engaged a contractor to inspect the exterior and interior of the Aircraft on August 3, 2020 and sough confirmation that the Aircraft would be permitted.

51. On October 17, 2020, the parties again discussed inspection of the Aircraft.

52. On December 1, 2020, NH threatened to dismantle and remove the Aircraft from National Harbor if it was not removed by February 1, 2021.

53. The parties continued to discuss the logistics of removing the Aircraft.

54. On February 9, 2021, Franklin again reiterated its intent to remove the Aircraft:

This is in follow-up to our discussions regarding potential removal of the Aircraft. Franklin remains committed to removing the Aircraft from National Harbor and has been making extensive efforts to do so.

> Franklin is in discussions with a potential rigger and barge to remove the Aircraft itself. However, as previously stated, it needs verification of the integrity of the Aircraft. Franklin was not involved in the move of the Aircraft at National Harbor. It needs verification of how it was moved and/or a report as to the integrity of the Aircraft (whether from the vendor who moved it or from [NH]). I have been requesting this information for months. Only when Franklin has this information can it proceed with retaining a rigger and barge.

55. On February 15, 2021, notwithstanding that Franklin had clearly communicated its intentions of removing the Aircraft, NH informed Franklin that NH had dismantled the Aircraft and removed it from National Harbor.

56. At no time did Franklin or Plaintiffs consent to the destruction of the Aircraft or otherwise indicate that they had abandoned such property. Indeed, throughout this dispute Franklin expressly and repeatedly advised NH that the Aircraft had not been abandoned. Among other things, Franklin, on behalf of Plaintiffs, demonstrated that the Aircraft had not been abandoned by repairing the tail and performing other repairs, removing the piling that would have prevented the removal of the Aircraft, performing a gas inspection, and inspecting the Aircraft.

## COUNT I
### (Trespass to Chattels)

57. AF1 owned the Airframe and 485EV owned the Engines, which comprised the Aircraft in NH's possession.

58. Franklin, Plaintiffs' agent, repeatedly advised NH that it intended to take possession of the Aircraft and sought NH's cooperation preparing the Aircraft for removal.

59. Despite NH's unreasonable unilaterally imposed deadlines for removal of the Aircraft, it was well aware that the Aircraft could not be removed without, *inter alia*, an inspection of the Aircraft, an inspection of the path to the waterway, an underwater and sonar-side scan, certification that the Aircraft was gas-free, and an order from the U.S. Coast Guard.

60. Moreover, NH was aware that it would be entitled to to compensation for the delay in removing the Aircraft to the extent Franklin was deemed a "Holdover" under the Agreement.

61. Notwithstanding the forgoing, NH took possession of the Aircraft without Plaintiffs' consent predicated upon the pretext that the Aircraft had been abandoned. While NH may have objected to protracted period of time in which the Aircraft remained in National Harbor, clearly Plaintiffs had not abandoned the Aircraft.

62. NH dismantled the Aircraft and removed it from National Harbor, preventing Plaintiffs from accessing and recovering the Aircraft.

63. As a result of NH's acts and omissions, Plaintiffs have incurred substantial damages, including but not limited to, the replacement value of the Aircraft.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendant in an amount greater than $20,000,000, plus costs, expenses, attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT II
**(Conversion)**

64. Plaintiffs incorporate the preceding Paragraphs as if fully stated herein.

65. NH dismantled the Aircraft and removed it from National Harbor, preventing Plaintiffs from accessing and recovering the Aircraft.

66. NH's conduct was intentional, without permission or justification, and constituted conversation of Plaintiffs' property.

67. As a result of NH's acts and omissions, Plaintiffs have incurred substantial damages, including but not limited to, the replacement value of the Aircraft.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendant in an amount greater than $20,000,000, plus costs, expenses, attorneys' fees, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/
Aaron J. Turner
Federal Bar No: 29822
Levin Gann PA
1 West Pennsylvania Avenue, Suite 900
Towson, Maryland 21204
Phone: (410) 321-0600
Fax: (410) 339-5762
aturner@levingann.com
Attorney for Plaintiff